In re JEBCO COAL COMPANY, INC., Debtor.

CREDIT ALLIANCE CORPORATION, a corporation, Plaintiff,

v.

FIRST NATIONAL BANK AND TRUST COMPANY OF WASHINGTON, PENNSYLVANIA and Jebco Coal Company, Inc., a corporation, Defendants.

Bankruptcy No. 79–890.
Adv. No. 80–287.

United States Bankruptcy Court, W. D. Pennsylvania.

June 10, 1981.

William M. Hoffman, Robert T. Harper, Pittsburgh, Pa., for defendant, 1st Nat'l Bank Trust.

James L. Weisman, Pittsburgh, Pa., for plaintiff, Credit Alliance Corp.

Mark Glosser, Pittsburgh, Pa., for defendant, Jebco Coal Co.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

Credit Alliance Corporation (Credit Alliance) instituted this proceeding by filing a Complaint for Relief from Stay provided under 11 U.S.C. § 362 naming First National Bank & Trust Co. of Washington, Pennsylvania (First National) and Jebco Coal Co. (Jebco) as defendants. The trial was held on December 1, 1980.

### HISTORY

On November 2, 1979, Jebco filed for relief under Chapter 11 of the Bankruptcy Code. At the time of the filing, Jebco had an interest in a 1974 Hough Payloader, Model No. 400c (Hough) under a lease option agreement with Equico Lessors (Equico). Equico, Credit Alliance and First National all claimed an interest in the Hough pursuant to various security agreements. Under the terms of the lease option agreement with Equico, Jebco was entitled to acquire title to the Hough free and clear of Equico's interest upon the payment of $12,000.00.

On January 3, 1980, Jebco, with the consent of Credit Alliance and First National, obtained leave of court to borrow $12,000.00 from First National to exercise its option with Equico. This loan was to be secured by a security interest in favor of First National, senior to the liens of the pre-Chapter 11 security interests of Credit Alliance and First National. The loan was concluded, the option exercised and the Hough ultimately sold by Jebco for $55,000.00. After repayment of the $12,000.00 loan to First National with interest, the net proceeds from the sale were deposited in a joint escrow pending the outcome of this adversary proceeding.

Additional equipment subject to the same conflicting claims of Credit Alliance and First National has been sold, and the proceeds from this sale have been added to the joint escrow. It appears that the escrow account now contains approximately $57,470.87. Two additional pieces of equipment worth approximately $25,000.00 are also subject to this dispute.

The issue to be decided is which of the two secured creditors, Credit Alliance or First National, has the prior perfected security interest in the proceeds deposited in the joint escrow and the other equipment.

### FACTS

Credit Alliance's claim of a security interest arises from a financing statement filed on January 20, 1975. The maturity date of this financing statement is disputed by the parties. About January 14, 1975 Credit Alliance financed the purchase by Jebco of the Fiat-Allis Loader and a 1974 Fiat-Allis Model HD21B Tractor from Highway Equipment Company. Jebco's obligation was evidenced by a Conditional Sale Contract Note (Note) dated January 14, 1975, which provided that Jebco granted Credit Alliance a security interest in the two pieces of equipment being purchased. On January 20, 1975, Credit Alliance filed the Standard Form UCC-1, the entire Note, the Payment Schedule, and Highway Equipment's assignment to Credit Alliance as a financing statement in the Office of the Prothonotary of Fayette County and in the Office of the Secretary of the Commonwealth in Harrisburg.

The Standard Form UCC-1 contained a specific box # 3 labeled "Maturity Date (optional)". Box # 3 was left blank. However box # 5 labeled "This Financing Statement covers the following type of property" contained the following: "All machinery, inventory, equipment and goods as described in attached entire agreement and/or in any schedule prepared in connection therewith, this UCC Form together with the attached security agreement and/or schedule are being submitted for filing herewith as a financing statement." The Conditional Sale Contract Note explicitly described a 1974 Fiat-Allis HD21B and

a 1974 Fiat-Allis Model 743H Loader and on the reverse side entitled "Terms and Conditions" contains these provisions: ". . . Buyer grants to Holder a security interest in any and all property wherever located, now or hereafter belonging to Buyer or in which Buyer has any interest and agrees that Holder's security interest created by this agreement secures any and all other obligations owing by Buyer to Holder."

Credit Alliance urges the Court to construe this provision as creating a security interest in all existing and future property of Jebco's as well as future advances by it to Jebco. First National argues: (1) that the Note does not contain any commitment by Credit Alliance to make future advances to Jebco, and that the above provisions cannot be construed as granting Credit Alliance a security interest to secure future advances; (2) First National also asserts that the financing statements filed in connection with the Note have lapsed and that Credit Alliance's later loans or advances are not protected by this 1975 Financing Statement.

On January 18, 1977, First National entered into a loan with Jebco, which involved the refinancing of the obligation then owed by Jebco to Credit Alliance under the 1975 Note. As part of the refinancing, Credit Alliance was to be paid and First National was to succeed to the first lien security interest. Credit Alliance supplied a payoff figure on the Jebco obligation under the Note and was paid in full by a Cashier's check dated January 18, 1977 from the proceeds of the 1/18/77 Loan from First National. First National filed its interests in the 1974 Fiat-Allis Model 745 Loader and the 1974 Fiat-Allis Model HD21 Tractor previously financed by Credit Alliance. In addition, Financing Statements were filed in a 1965 Fiat-Allis HD21, a 1968 Caterpillar Model 977, and a 1974 John Deere Diesel JD310.

The testimony indicated that Jebco's president, Mr. J. R. Cornell, did not believe that Credit Alliance was obligated to lend Jebco additional money in the future under the 1975 Note and after the Note was paid off by First National and he believed that Jebco was free of any obligations with respect to Credit Alliance. Mr. Donald Dunst, First National's Loan Officer, testified that he believed that there were no commitments by Credit Alliance to make further advances to Jebco under the 1975 Note and further testified that First National believed it was receiving a first lien security interest on 4 pieces of equipment.

It is admitted that even though Jebco's obligation to Credit Alliance under the Note was paid off in full at the time of the 1/18/77 Loan, Jebco failed to request Credit Alliance to terminate the financing statements filed by Credit Alliance. Mr. Cornell testified that he did not have a lawyer and was unaware that he was required to give Credit Alliance written instructions to terminate the financing statements and further that Credit Alliance never informed him of this requirement.

On April 24, 1978, First National extended additional credit to Jebco and refinanced Jebco's 1/18/77 Loan pursuant to the terms of the 4/24/78 Loan described previously. A 1974 Hough Payloader Model H40C was added and the 1974 Fiat-Allis Model HD21 deleted from the financing statement and security agreement.

On May 10, 1978 Jebco again borrowed $200,596.68 from Credit Alliance, executing a promissory note payable to plaintiff in that amount to purchase a 1975 Caterpillar Excavator. In order to secure payment of this note, Jebco executed a Security Agreement/Mortgage on Goods and Chattels granting Credit Alliance a security interest in all goods, chattels, machinery, equipment, inventory, accounts, chattel paper, notes receivable, accounts receivable, furniture, fixtures and property of every kind and nature wherever located then or thereafter belonging to defendant. Credit Alliance filed on May 15 a Financing Statement with block # 5 containing identical language described in the 1975 Statement. The debtor defaulted on payment of the sums due under the promissory note. After repossession and sale of a 1975 Caterpillar Excavator Model 245 covered by the Securi-

ty Agreement, there remains a deficiency balance claimed by the plaintiff Credit Alliance in the amount of $74,193.47. By Counterclaim at Adversary No. 80–287 Jebco disputes the deficiency and alleges that the sale was in a commercially reasonable manner. This claim is not resolved and is not decided here. Credit Alliance claims that its deficiency judgment is secured by the Financing Statement filed on January 20, 1975. On December 20, 1979 and December 21, 1979, respectively, Credit Alliance continued the filings of the financing statements filed in 1975 by filing continuations with the Secretary of the Commonwealth and the Prothonotary of Fayette County.

## DISCUSSION

■ Within the scheme of the UCC, the Financing Statement and the Security Agreement serve different purposes. For perfection to occur and for the security interest to attach at least three events must occur. These events may occur in any order. A financing statement needs to be filed, a security agreement needs to be intended, and value or consideration given. Other matters being equal, as between competing security interests the first to file is victorious.

■ Credit Alliance argues that its financing statement filed on January 20, 1975 and continued in December, 1979 permitted Credit Alliance to advance value at any time during the pendency of their financing statements and to achieve a priority from January 20, 1975. As between perfected security interests, the order of filing governs regardless of which security interest attached first. See 13 Pa.C.S.A. § 9312(e)(1).

The parties dispute whether a 1975 Financing Statement protected future advances. Credit Alliance and First National dispute the meaning of several provisions in the 1975 Security Agreement upon which Credit Alliance relies for future advance language. We find that language ambiguous. First National relies on *Coin-O-Matic Service Co. v. Rhode Island*, 3 U.C.C.Rep. 1112 (R.I.Super.Ct.1966) and the line of cases that follow *Coin-O-Matic*. Those cases require the security agreement to provide for future advances, if such future advances are to be perfected without the filing of new financing statements.

■ Credit Alliance relies on the view supported by the U.C.C. drafters and by the "1972 Amendments" (not as yet adopted in Pennsylvania). We believe those views are the majority view and the Pennsylvania view; to-wit, if an *adequate* financing statement is filed, whether or not the original security agreement contemplates future advances is not determinative, the financing statement is notice and a later security agreement given for value achieves the priority of the original financing statement which was filed. This Court holds that to be the Pennsylvania view.

More importantly, the parties dispute the adequacy and the notice provided by the 1975 Financing Statement. The formal requisites of a financing statement are described in 13 Pa.C.S.A. § 9402. The general rule is that a simple financing statement is sufficient. Credit Alliance utilized the form UCC-1 approved by the Commonwealth. However, Credit Alliance in box # 5 of the standard form, designed to describe the property covered, submitted the entire security agreement and the related schedules "... Herewith As A Financing Statement."

First National argues that the attachment of the security agreement and the related schedules as a financing statement means that Credit Alliance is bound by all the terms in the security agreement as a financing statement for the notice that the U.C.C. requires in a financing statement.

■ First National also argues further that even if the security agreement were not made a part of the financing statement, the terms of the security agreement contain a maturity date which is binding on the financing statement. We do not decide this issue.

Credit Alliance offers the argument as to requirements that all that was needed for a valid filing statement was a standard

UCC-1 form, that such a form was filed, and that in box # 3 "maturity date" was left blank. Credit Alliance argues that leaving that box blank has been interpreted by the Pennsylvania Supreme Court to mean five years. *Heights v. Citizens National Bank*, 463 Pa. 48, 56, 342 A.2d 738, 741 (1975). If Credit Alliance had filed only the standard UCC-1 form and left box # 3 blank, this Court believes their claim would be quite strong. However, Credit Alliance did not describe in box # 5 the property to be covered but made the entire security agreement a part of the financing statement.

13 Pa.C.S.A. § 9402(e) states:

Effect of minor errors—A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

The notice as filed by Credit Alliance was in fact the entire security agreement as a financing statement. The only date to be inferred from the financing statement was the date in the security agreement. We therefore hold that when a specific date can be inferred from the agreement which is a part of the financing statement, a blank in the maturity box # 3 cannot be read to mean five years! To interpret a blank space under these circumstances would be seriously misleading. The Uniform Commercial Code, as incorporated in 13 Pa.C.S.A. § 9403(b), provides that a financing statement with a maturity date is effective until such maturity date and thereafter for a period of 60 days. Credit Alliance did not continue this financing statement within the required time. First National also argues that Credit Alliance had direct knowledge because this obligation to Credit Alliance was paid by First National and that Credit Alliance did not rely on the 1975 Financing Statement because Credit Alliance in 1978 took a purchase money security interest in the Caterpillar Tractor, the deficiency on which is the subject of the dispute. All of this may or may not be fact but it is not dispositive of this dispute. If the financing statement filed in 1975 was effective for five years and continued it

would provide the requisite notice and knowledge would not invalidate it. We hold that by its terms the financing statement was limited to January 20, 1978 plus sixty days. When a financing statement attaches the security agreement to the financing statement, the more detailed security agreement governs. In addition, because this 1975 debt and security agreement were paid according to their terms, valid questions could be raised as to the meaning of a continuation filing.

A continuation in December, 1979 of the 1975 UCC-1 form necessarily continues the language in block # 5. Such a continuation statement in 1979 would not provide adequate notice of property to be covered by a security agreement.

## CONCLUSION

The Uniform Commercial Code requires only a simple notice. If the parties add information they should be bound by it.

The Credit Alliance 1975 Financing Statement was valid for the maturity term of the Security Agreement which Credit Alliance made a part of the Financing Statement. The Continuation Statement filed in December, 1979 was too late in time and did not contain an adequate description of the property to be covered to give notice.